## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal Nos. 2:08-cr-00628-JMG-5 |
| | : | and 2:10-cr-00685-JMG-1 |
| MARVIN NEAL | : | |

_____

### MEMORANDUM OPINION

**GALLAGHER, J.**                                                 **October 9, 2020**

Marvin Neal seeks a compassionate release from his 240-month prison sentence pursuant to 18 U.S.C. § 3852(c)(1)(A). (Dkt. No. 08-cr-628, ECF No. 234; Dkt. No. 10-cr-685, ECF No. 30). Neal argues that his medical conditions—body mass index of 29.3, asthma, and high blood pressure—increase the likelihood of severe outcomes from the novel COVID-19 virus. For the reasons set forth below, Neal's Motion will be **DENIED**.

### I.    BACKGROUND

#### A.  Drug distribution Offenses (Dkt. No. 08-00628-05)

Neal was arrested as part of a "reverse sting" by the FBI in 2008. (Presentence Report ("PSR") on file with the Court, ¶ 15.) A confidential source ("CS") for the FBI was introduced to Neal and four co-conspirators as a large-scale cocaine distributor from Mexico who could supply the men with a high volume of cocaine. (*Id.* ¶ 15.) A plan was hatched in which Neal and his co-conspirators would purchase 25 kilos of cocaine from the CS for $190,000 upfront and the balance owing. (*Id.* ¶ 18.)

The drug transaction was arranged to take place at a Home Depot/Walmart parking lot in South Philadelphia. (*Id.* ¶ 18–21.) When Neal arrived at the parking lot, he removed the cocaine

from the delivery vehicle and was arrested. (*Id.* ¶ 23.) Neal was charged with three drug-related

offenses, all of which he pled guilty to on December 22, 2010.[1] (Dkt. No. 08-628, ECF No. 145-

46.)

### B. Money Laundering (Dkt. No. 10-00685-01)

In 2007, Internal Revenue Service ("IRS") agents in Delaware began a financial

investigation of Neal after the Drug Enforcement Agency ("DEA") informed the IRS that Neal

was involved in drug trafficking. (PSR ¶ 24). Law enforcement had recovered large sums of cash

from Neal or his residence on at least four occasions:

> June 2000, Chicago, IL: Neal was the target of an interdiction
> stop attempting to transport $37,375 in cash from Philadelphia to
> Los Angeles, California. Prosecution was declined and the
> currency was seized and forfeited.
>
> June 2003, Delaware: Neal was arrested by state police after they
> executed a search warrant at his residence and recovered $49,295 in
> cash (of which $49,000 was in a box in the master bedroom) and a
> loaded firearm (which was underneath the bed in the master
> bedroom). The Attorney General's Office later dropped the criminal
> charges but forfeited the money.
>
> April 2006, Delaware: Neal stopped by state police. Police seized
> $4,672 cash. Neal stated that he was unemployed at that time, but
> received rental income. An ion-scan for the presence of
> controlled dangerous substances was positive on the currency
> and it was forfeited.
>
> September 2006: Delaware: Police respond to a burglary in progress
> at Neal's Bear, Delaware, residence.  Officers found Neal bloodied
> and severely beaten. The investigation revealed that four masked

---

[1] Neal pled guilty to the following counts, all of which are Class A felonies:

Count One: Conspiracy to possess with intent to distribute five kilograms or more of cocaine in
violation of 21 U.S.C. § 846;

Count Two: Attempted possession with intent to distribute five kilograms or more of cocaine in
violation of 21 U.S.C. § 846; and

Count Three: Possession with intent to distribute five kilograms or more of cocaine and aiding and
abetting in violation of 21 U.S.C. § 841 (b)(1)(A) and 18 U.S.C. § 2.

> gunmen attempted a home invasion. Neal escaped by leaping from a bedroom window. The gunmen fled prior to police arrival. Police found an undetermined amount of marijuana at the residence as well as three packages containing large sums of cash. One lot of currency, $10,000, was contained within a Victoria Secret bag. A K-9 alerted for the presence of drugs on the currency. A second lot of currency, $4,000, was found in a purse and a third lot of currency, $1,300, was also taken. Subsequent ion-scans for the presence of drugs were positive. The police report also indicated that officers observed approximately twelve watches strewn upon a bed in one of the bedrooms. Neal's wife later reported to police that an additional eight watches, a diamond necklace, and a ring were also taken during the burglary.

(*Id.* ¶ 24.)

In November 2007, IRS and DEA agents executed a search warrant at Neal's Delaware residence. (*Id.* ¶ 25.) The agents confiscated watches and jewelry, including a single pair of earrings with a price tag of $17,052. (*Id.*) Agents obtained a search warrant for Neal's wife's safety deposit box at Commerce Bank in Wilmington, Delaware and recovered $50,000 in cash along with jewelry from it. (*Id.*) An ion scan performed on the bills showed a high concentration of cocaine residue. (*Id.*) Records showed that Neal accessed the safety deposit box shortly before the seizure. (*Id.*)

Additionally, IRS agents analyzed Neal's and his wife's expenditures from 2003 through 2007, finding $581,081 in cash had been deposited into their joint and individual accounts and that much of this income was not disclosed on their income taxes. (*Id.* ¶ 26.) The analysis also revealed that expenditures exceeded legitimate income by more than $700,000. (*Id.*) The income reported on their tax returns was from Neal's wife's wages at Bancorp, Inc. and income from their rental properties, with no wages or salaries reported for Neal during this time period. (*Id.*) Neal was charged with one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The matter was transferred from the District of Delaware to the Eastern District

of Pennsylvania. Neal pled guilty to this charge along with the aforementioned drug charges on December 22, 2010. (Dkt. No. 08-628, ECF Nos. 143, 145; Dkt. No. 10-685, ECF No. 4.)

### C.  Plea and Sentence

Neal entered a written plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) wherein Neal and the government agreed upon a sentence of 240 months of incarceration and 10 years of supervised release. (Dkt. No. 08-628, ECF No. 146 ¶ 9.) Judge Lawrence F. Stengel sentenced Neal to 240 months' imprisonment with 10 years of supervised release for Counts 1, 2, and 3 on Indictment Number 08-CR-628 and 240 months' imprisonment with 3 years supervised release on Count 1 of Information Number 10-CR-685, all to run concurrently. (Dkt. No. 08-628, ECF No. 199 at 3; Dkt. No. 10-685, ECF No. 17 at 3.)

Neal has been serving his sentence in federal custody at FCI Ashland with an anticipated release date of December 1, 2025. (*See* Gov't Ex. C.) In his current period of incarceration, Neal has had three disciplinary infractions: (1) smoking marijuana in 2010; (2) being in an unauthorized area in 2018; and (3) refusing to accept a program assignment in 2018. (*See* Gov't Ex. B, C; Gov't Opp'n at 6, 27.)

### D.  Administrative Requests and Motion for Compassionate Release

Neal submitted written requests for compassionate release to the Warden of FCI Ashland on March 30, 2020, and March 31, 2020. (Def.'s Ex. A.) Neal submitted a third request on May 5, 2020. (Def.'s Mot. at 6.) The warden denied Neal's requests in letters dated May 11, 2020, and May 18, 2020. (*Id.* Ex. B.)

Through counsel, Neal filed the instant motion for compassionate release on July 27, 2020. (Def.'s Mot., Dkt. No. 08-628, ECF No. 234; Dkt. No. 10-685, ECF No. 30.) Defendant requests a reduction to time served or modification of his supervised release to home

confinement because he is 52 years old with chronic asthma, hypertension, and a body mass index ("BMI") of 29.3. (*Id.* at 1.) Neal argues these health issues constitute extraordinary and compelling reasons for his release given the ongoing COVID-19 pandemic because these factors may increase his potential for severe complications if he contracts the virus. (*Id.* at 1–2.) Neal asserts that he and other inmates are in "unavoidably close quarters" and the number of infections is "unyielding," exacerbating the problem and requiring his release. (*Id.* at 1.)

## II.     DISCUSSION

### A.  Applicable authority for motions for compassionate release pursuant to 18 U.S.C. § 3852(c).

The compassionate release statute allows district courts to reduce defendants' sentences when there are "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).[2] Before granting compassionate release, the court must consider the applicable section 3553(a) sentencing factors and the applicable policy statements from the United States Sentencing Commission ("Commission").[3] 18 U.S.C. § 3582(c)(1)(A)(i).

---

[2] The statute, as amended by the First Step Act, permits defendants to file a motion for compassionate release after having exhausted their administrative remedies. 18 U.S.C. § 3582(c)(1)(A). To exhaust administrative remedies, the defendant must file a "request" with the Bureau of Prisons ("BOP") asking it to bring a motion for compassionate release on the defendant's behalf. *Id.* After either BOP has denied this request (and defendant has pursued all administrative appeals) or thirty days has passed since the warden received the request, whichever is earlier, the defendant has exhausted his remedies and may file his own motion for compassionate release in federal court. *Id.*

Neither party disputes, and the Court finds, that Neal has exhausted his administrative remedies. More than thirty days passed between his letters to the warden requesting release and the instant motion, and the warden denied the requests. *See* Def.'s Ex. A, B.

[3] The statute provides that a court:

> may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)     extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

"Extraordinary and compelling reasons" was not defined in the compassionate release statute. Rather, Congress delegated the authority to define the term to the Commission. *See* 28 U.S.C. § 994(t). The only guidance that Congress provided was that "[r]ehabilitation of the defendant alone" is insufficient to constitute an "extraordinary and compelling reason." *See id.* Accordingly, the Commission issued a policy statement identifying three potential "extraordinary and compelling" circumstances: the defendant's (1) medical condition,[4] (2) age,[5] or (3) family circumstances.[6] U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). The policy also includes a

---

18 U.S.C. § 3582(c)(1)(A)(i).

[4] The Commission explained that the medical condition of the defendant may be an extraordinary and compelling circumstance when:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

> (ii) The defendant is —

> (I) suffering from a serious physical or medical condition,

> (II) suffering from a serious functional or cognitive impairment, or

> (III) experiencing deteriorating physical or mental health because of the aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1.

[5] Pursuant to the Commission's guidance, the defendant's age may be an extraordinary and compelling circumstance if:

> The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13 cmt. n.1.

[6] The Commission advised that the following family circumstances may warrant a sentence reduction:

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

fourth "catch-all" provision where compassionate release may be appropriate based on "other reasons" to be determined by the Director of the BOP. *Id.* § 1B1.13 cmt. n.1(D). After the First Step Act's amendments to the compassionate release statute, courts typically apply the catch-all fourth category not only to the BOP Director but also to the courts. *See, e.g.*, *United States v. Rodriguez*, No. 03-271, 2020 U.S. Dist. LEXIS 58718, at *17 (E.D. Pa. Apr. 1, 2020) (finding the policy statement provides "helpful guidance" but is "not ultimately conclusive" (citations omitted)).

In the context of the COVID-19 pandemic, courts have largely limited compassionate release to situations where a defendant "suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." *United States v. Wragg*, No. 15-398, 2020 U.S. Dist. LEXIS 125244, at *21 (E.D. Pa. July 16, 2020) (quoting *United States v. Somerville*, No. 12-225, 2020 U.S. Dist. LEXIS 93935, at *18 (W.D. Pa. May 29, 2020)). Release is not justified merely by the "existence of COVID-19 in society and the possibility that it may spread to a particular prison." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Upshur*, No. 18-124-2, 2020 U.S. Dist. LEXIS 103067, at *4 (E.D. Pa. June 12, 2020) (finding generalized COVID-19 fears and speculation do not warrant release) (citation omitted).

A defendant has the burden of establishing circumstances warranting his release. *See United States v. Adeyemi*, No. 06-124, 2020 U.S. Dist. LEXIS 117743, at *45 (E.D. Pa. July 6, 2020) (citation omitted). "When a prison is able to keep the number of COVID-19 cases low . . . the risk of exposure is too speculative to render the circumstances extraordinary and compelling." *United States v. Justis*, No. 15-416, 2020 U.S. Dist. LEXIS 134861, at *7 (E.D. Pa. July 29, 2020). Likewise, if a defendant's medical issues are not sufficiently serious, he has not

---

U.S.S.G. § 1B1.13 cmt. n.1.

met this burden. *See Wragg*, 2020 U.S. Dist. LEXIS 125244, at *24 (finding medical conditions did not place defendant at uniquely high risk of illness or death from COVID-19 and defendant failed to show non-speculative risk of contracting COVID-19 at his correctional facility). In other words, a defendant must show that (1) he has either advanced age or a serious medical condition placing him at uniquely high risk of serious complications such as "grave illness or death" from COVID-19, and (2) there is a significant presence of cases at his facility to show that his risk of exposure to the virus is more than speculative. *See Somerville*, 2020 U.S. Dist. LEXIS 93935, at *20.

If the defendant has presented extraordinary and compelling circumstances, the court must then weigh those circumstances against the section 3553(a) sentencing factors to determine whether and to what extent sentence reduction is warranted. *See id.* at *2. The section 3553(a) factors that are applicable to compassionate release are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a)(1)-(2), (6).

Finally, the court must consider whether a sentence reduction is consistent with the Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A)(i). The applicable policy statements require courts to assess the defendant's "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Factors relevant to this assessment include "the nature and circumstances of the offense," "the history and characteristics of the person," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1), (3), (4).

### B. Neal's medical conditions do not meet the standard for extraordinary and compelling reasons, and FCI Ashland is taking appropriate mitigation steps.

Neal alleges that his age of 52 years, high blood pressure, and asthma constitute extraordinary and compelling circumstances warranting early release in light of the COVID-19 pandemic.[7] We do not find these conditions—individually or collectively—warrant the requested relief.

---

[7] In the introductory paragraph of his motion, Neal includes his BMI among the conditions that justify compassionate release. That is the only reference to his BMI in the motion. To the extent that Neal contends that his BMI is an extraordinary and compelling circumstance, the Court disagrees.

Neal's BMI is alleged to be 29.3, which is below the higher-risk threshold provided by the CDC. The CDC guidelines identify individuals with a BMI of 30 or above as having a unique risk of severe illness from COVID-19. *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Aug. 31, 2020). Recognizing that Neal's BMI has fluctuated and was 32.4 in October of 2019, *see* Gov't Opp'n at 24; Gov't Ex. A at 23 (recording Neal's height as 71" and weight as 232 lbs. at October 29, 2019, clinic visit), similarly situated district courts have not found this factor sufficient to grant compassionate release. *See United States v. Daniels*, No. 15-127, 2020 U.S. Dist. LEXIS 144384, at *8–9 (E.D. Pa. Aug. 12, 2020) (finding defendant's asthma and hypertension controlled by medications were not extraordinary and compelling reasons for release, and although defendant's obesity was, it was "not determinative" of the motion); *United States v. Whiteman*, No. 15-298, 2020 U.S. Dist. LEXIS 132236, at *3–4 (E.D. Pa. July 27, 2020) (finding defendant's "obesity and high blood pressure fall short of presenting an extraordinary and compelling reason for his release"); *United States v. Yanney*, No. 4:15-CR-298, 2020 U.S. Dist. LEXIS 116480, at *10 (M.D. Pa. July 2, 2020) (denying compassionate release for defendant with history of obesity and current BMI of 30.51 along with hypertension). The Court finds that Neal's current BMI of 29.3 is below the level cautioned by the CDC as increasing an individual's risk of severe illness from COVID-19. As such, it does not constitute an extraordinary and compelling reason for his release.

First, Neal points to his age of 52 years as significantly advanced to place him at a higher risk of severe illness from COVID-19. Although the Centers for Disease Control and Prevention ("CDC") has recognized a heightened risk as age increases, Neal is not in the category of individuals 65 and older who are designated at-risk. *See Coronavirus Disease 2019 (COVID-19): Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated Aug. 16, 2020) (last visited Sept. 1, 2020) ("8 out of 10 COVID-19 deaths reported in the U.S. have been in adults 65 and older."). As such, Neal's age is an insufficient justification for release. *See United States v. Ackerman*, No. 11-740, 2020 U.S. Dist. LEXIS 153883, at *16–18 (E.D. Pa. Aug. 25, 2020) (finding age of 59 years insufficient to justify requested release); *see also United States v. Haney*, No. 19-cr-541, 2020 U.S. Dist. LEXIS 63971 at *5 (S.D.N.Y. Apr. 13, 2020) (finding if "age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention," which is contrary to the "limited scope of compassionate release").

Second, Neal asserts that his hypertension and asthma significantly increase his risk of serious complications from COVID-19. The CDC does recognize that individuals with hypertension and moderate-to-severe asthma "might be at an increased risk" for severe illness from COVID-19. *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, *supra*. However, Neal's medical records show that his hypertension is ordinary,[8] his

---

[8] *See* Gov't Ex. A at 16, 18, 19, 22, 65, 95 (showing blood pressure readings at clinical encounters in 2019). Although the Court cites to the Government's exhibit when referring to Neal's medical records, it notes that the medical records provided by Neal's counsel, Exhibit D to his Motion, appear to contain identical information. All of Neal's blood pressure readings recorded in 2019 are in Hypertension Stage 1 or Hypertension Stage 2. *See High Blood Pressure*, AMERICAN HEART ASSOCIATION, https://www.heart.org/en/health-topics/high-blood-pressure (last visited Sept. 1, 2020); *see also Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*,

asthma is mild,[9] and both are currently controlled with medications.[10] Other courts have found these conditions do not justify early release. *See, e.g.*, *Ackerman*, 2020 U.S. Dist. LEXIS 153883, at *12-13 (finding compassionate release not warranted with regular hypertension); *United States v. Torres*, No. 18-414, 2020 U.S. Dist. LEXIS 114002, at *19–20 (E.D. Pa. June 29, 2020) (denying compassionate release based on asthma where objective medical evidence showed condition was mild). Based on the Court's review of Neal's medical records, Neal has not needed to refill his Albuterol inhaler before the designated time, supporting the conclusion that it is used less than daily, as directed. *See* Gov't Ex. A. at 44. Neal has also had normal lung function tests and blood oxygen saturation rates on all but one occasion when his Wright Peak Flow test, which measures a person's maximum rate of exhalation, was below normal at 350, but his blood oxygen saturation rate remained at 99%.[11] *See* Gov't Ex. A at 23, 65-66, 100, 119 ("Good" recorded for effort next to Peak Flow numbers or approximately normal number recorded for Peak Flow and Sa02 at clinic visits); *contrast id.* at 70, 74 (Peak Flow of 350 on 04/09/19); 75 (SaO2 of 99% on 04/09/19).

---

*supra*, (differentiating between increased risk caused by pulmonary hypertension and possible risk from normal hypertension).

[9] *See* Gov't Ex. A at 31 (defining Neal's condition as "asthma, unspecified. Mild intermittent. Recurrent flare ups"); *id.* at 118 (visit with care clinic on 09/14/2018 stating Neal was "not hospitalized since childhood and never intubated . . . He only needs albuterol occasionally and uses the Mometesone only when the asthma exacerbates"); *see also id.* at 2 (follow-up visit at clinic in December 2019 reporting improvement in breathing after starting Flonase).

[10] *See* Gov't Ex. A at 44 (script for asthma inhaler advising not to use daily filled 10/29/2019 for refill 10/28/2020 and directing "If need more, make sick call"); *id.* at 45 (script for hypertension medication); *id.* (script for Mometasone dispensed 7 times in 245 days for controlling when asthma exacerbated); *id.* at 118 (clinical notes from Sept. 14, 2018, stating that Neal has "hypertension about 6-7 months currently controlled on meds").

[11] *See Clinical Care Guidelines: Predicted Average Peak Respiratory Flow*, MICHIGAN MEDICINE: UNIVERSITY OF MICHIGAN, https://www.med.umich.edu/1info/FHP/practiceguides/asthma/pefrates (last visited Sept. 1, 2020). As recorded on October 19, 2019, Neal is 71 inches tall. Gov't Ex. A at 23.

Despite indications to the contrary, *see supra*, Neal argues that he does use his inhaler daily. This is significant because it would increase his asthma risk from mild to moderate, according to one indicating factor set out by the U.S. Department of Health and Human Services.[12] Reviewing Neal's medical records, the inhaler prescription specifically says that it should *not* be used daily and is dispensed according to this instruction. *See United States v. Towel*, No. 17-519-6, 2020 WL 2992528, at *4–5 (E.D. Pa. June 4, 2020) (finding lack of support for symptoms of moderate asthma where medication stated it should not be used on a daily basis and his renewal period supported that it was not used daily). The record before the Court shows that Neal's asthma is controlled and treatable with medication, and Neal has not provided conflicting medical information. Although Neal admits that his asthma and hypertension "may be under control with medication," he argues that this does not indicate that his risk from COVID-19 is mitigated as it concerns his asthma. *See* Def.'s Mot. at 19–20. In fact, the CDC recommends keeping asthma under control as the first note under the title "Asthma (moderate to severe) . . . Actions to take." *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, *supra*. The record also shows that the BOP is providing Neal access to appropriate and timely medical care as needed. As such, the Court cannot conclude that Neal is unable to "provide self-care within the environment of a correctional facility," including

---

[12] *See Asthma Care Quick Reference Guide*, U.S. DEP'T OF HEALTH AND HUMAN SERVS., (Sept. 2012), https://www.nhlbi.nih.gov/sites/default/files/media/docs/12-5075.pdf. The U.S. Department of Health and Human Services provides that moderate asthma occurs if, without treatment, any of the following are true:

  • Symptoms occur daily;
  • Inhaled short-acting asthma medication is used every day;
  • Symptoms interfere with daily activities;
  • Nighttime symptoms occur more than 1 time a week, but do not happen every night; or
  • Lung function tests are abnormal (more than 60% to less than 80% of the expected value).

care for his asthma, such that release would be warranted. *See* U.S.S.G. 1B1.13, Application Note 1(A)(ii).

But even assuming Neal's health conditions place him at an increased risk of bad outcomes from COVID-19, he still does not qualify for compassionate release. Neal has failed to show that there is a non-speculative risk of exposure to the virus at FCI Ashland. According to Neal's counsel, as of August 25, 2020, FCI Ashland had 1,300 total inmates[13] and had performed 121 tests for COVID-19, with 5 inmates testing positive, marking an increase from the single positive result as of the government's filing on August 14, 2020.[14] *See* Gov't Opp'n at 11; Bureau of Prisons, *FCI Ashland*, https://www.bop.gov/locations/institutions/ash/ (last visited Sept. 1, 2020). The Court independently reviewed the BOP website, and notes that as of the date of this memorandum, 193 tests have been completed at FCI Ashland, with 10 total positive inmate results (2 currently positive). *See* Bureau of Prisons, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Oct. 8, 2020). In addition, the BOP reported that 5 inmates and 4 staff members have already recovered. *Id.*

Although the Court understands Neal's concerns about the spread of COVID-19, particularly in light of his health issues and the fact that the CDC has identified non-Hispanic Black individuals as having a generally increased risk from COVID-19,[15] the Third Circuit has warned that the BOP's "statutory role, and its extensive and professional efforts to curtail the

---

[13] As of the date of this memorandum, FCI Ashland currently has 1,079 total inmates. Bureau of Prisons, *FCI Ashland*, https://www.bop.gov/locations/institutions/ash/ (last visited Oct. 8, 2020).

[14] Neal's counsel followed-up on September 14, 2020, advising the Court that as of that date at FCI Ashland, 3 inmates were positive for COVID-19, 2 inmates had recovered, 3 staff members were currently positive, and one staff member had recovered.

[15] *See Health Equity Considerations & Racial & Ethnic Minority Groups*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last visited Sept. 1, 2020).

virus's spread" make the existence of COVID-19 insufficient to independently justify

compassionate release. *Raia*, 954 F.3d at 597. Neal has not presented evidence of widespread

transmission of the virus in his current facility, FCI Ashland. Without such evidence, Neal has

failed to show a non-speculative transmission risk constituting extraordinary and compelling

circumstances that would justify compassionate release. *See, e.g.*, *United States v. Gold*, No. 15

CR 330, 2020 U.S. Dist. LEXIS 79539, at * 5 (N.D. Ill. May 6, 2020) (finding even courts that

take a "liberal view" of the Commission's policy statements routinely deny compassionate

release if defendant's facility does not have widespread transmission and defendant's health risk

factors are shared by many other prisoners).

Moreover, Neal's concerns must be weighed against the ongoing mitigation steps that the

BOP is taking at its facilities, including FCI Ashland, to curb the spread of the virus. *See* Bureau

of Prisons, *BOP Implementing Modified Operations*,

https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Aug. 31, 2020). These steps

include suspending social visits, quarantining new inmates, limiting internal inmate movement

with limited exceptions such as court appearances or bed space management to prevent

overcrowding, and screening staff and inmates. *Id.*

After considering all of the above, the Court finds that Neal has failed to show

extraordinary and compelling circumstances justifying his release.

**C.  The section 3353(a) sentencing factors weigh against Neal's release.**

Even if Neal had presented extraordinary and compelling reasons, the compassionate

release analysis would not end there. The Court would still need to consider whether the section

3553(a) sentencing factors support a sentence reduction and whether these factors *outweigh* the

extraordinary and compelling circumstances. These factors include (1) "the nature and

circumstances of the offense and the history and characteristics of the defendant," (2) "the need for the sentence imposed," and (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1)-(2), (6). For the reasons discussed below, the Court concludes that even if Neal had established an extraordinary and compelling reason for compassionate release, the sentencing factors would weigh against such a sentence reduction.

The nature and circumstance of Neal's crimes here are exceedingly serious. While the offenses of conviction did not involve the use of violence by Neal, the harms caused to society by the distribution of controlled substances are legion, and often violent. Those who partake in such crimes are profiting directly from the pain and misery of others—the addicted who desperately depend on the dealers for their next fix, the families and friends of the addicted who endure the unbearable heartbreak of watching their loved ones deteriorate, the greater community who is targeted by those desperate to fuel their addiction by stealing from family and strangers alike, and the far too many children and adults who are victimized by the violence and gunplay bred by the business of drug dealing. The serious nature of Neal's crimes—drug distribution/trafficking and money laundering—weighs against his release.

In addition, releasing Neal now would not serve the purpose of the sentence—"to reflect the seriousness of the offense," "to promote respect of the law," "to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A), (B). The Court notes that Neal had a felony history from his involvement as part of a drug distribution organization before the convictions resulting in his current incarceration.[16]

---

[16] In 1992, Neal was convicted in this district of conspiracy and distribution of heroin and cocaine. *See* Dkt. No. 92-cr-00504-08 (misidentified in the PSR as Dkt. No. 96-00046-01). He was sentenced by the Honorable James T. Giles to 36 months' imprisonment and five years of supervised release. *See id.* ECF No. 577. While under the

*See* PSR ¶¶ 65-67. After serving his first federal prison sentence for drug distribution, Neal returned to the same illicit trade, participating in a multi-kilogram cocaine deal. This indicates to the Court the apparent lack of meaningful impact that Neal's initial conviction had upon his subsequent criminal conduct. Neal's legitimate work history, as reflected in the PSR, is extremely limited. *See* PSR ¶¶ 88-90. His repeated unexplained accumulation and possession of large quantities of cash demonstrates that he has been undeterred either by his prior conviction or by law enforcement's repeated seizures of his assets.

Neal, however, suggests that the purpose of his sentence has been served. He maintains that he has been rehabilitated; he has participated in various multi-hour programs and any disciplinary infractions he obtained were minor. [17] Courts may, in resentencing a defendant, consider rehabilitation and should "always sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 491-92 (2011) (citing *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam)). While the Court certainly commends Neal's efforts at rehabilitation,[18] this alone does not outweigh the seriousness of the offenses and the other sentencing considerations discussed herein.[19]

---

Court's supervision, Neal violated the terms of his release by testing positive for marijuana ingestion on no less than eight occasions. *See* PSR ¶¶ 66-67.

[17] The Court recognizes that Neal has occasionally run afoul of the institutional rules during his current period of incarceration. His disciplinary history also includes multiple infractions during a prior period of federal incarceration for fighting (1994), unauthorized physical contact (1994), using the phone without authorization (1994), and possession of drugs or drug paraphernalia (1992). *See* Gov't Ex. B.

[18] Neal's wife, Gail Hightower-Neal, submitted a letter dated September 14, 2020, detailing the rehabilitative efforts her husband has taken while in prison and the plans in place should he be released. The Court has considered this letter along with the other documentation that was provided.

[19] Although "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for compassionate release, *see* 28 U.S.C. § 994(t), the Court may consider rehabilitation among the other relevant sentencing factors.

Finally, the Court does not find Neal's argument—that his incarceration has met the sentencing goals in part because his sentence would have been lower if it were imposed today—to be persuasive. Long after Neal was sentenced, Congress decreased the mandatory minimum for Neal's offenses from 20 years to 15 years.[20] First Step Act, Pub. L. No. 115-391, § 401(c), 132 Stat. 5194, 5220 (2018). Based on this modification, Neal speculates that if he were to be sentenced today, his sentence would "likely" be this new minimum, supporting his contention that he has "served a sentence sufficient to satisfy the purposes of sentencing." Def.'s Mot. at 23–24. Like the government, I am not convinced: it is not known "whether the government would have recommended or the Court [would have] imposed the new mandatory minimum even if it applied." *See* Gov't Opp'n at 27.

Accordingly, for the reasons discussed above, the Court concludes that the sentencing factors would not outweigh the alleged extraordinary and compelling reasons for compassionate release.

### D.  The factors contained in the Commission's policy statements also weigh against Neal's release.

Not only do courts have to consider the applicable sentencing factors as part of the compassionate release analysis, they must also determine, pursuant to the Commission's policy statement, whether the defendant remains a "danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13 (citing to 18 U.S.C. § 3142(g)). To make this determination, courts consider "the nature and circumstances of the offense," "the history and characteristics of

---

[20] Congress purposefully did not make Section 401 of the First Step Act retroactive, stating that it applies only to sentences imposed after the date of enactment, December 21, 2018. First Step Act, Pub. L. No. 115-391, § 401(c), 132 Stat. 5194, 5220 (2018). "Imposed," as used in this section, "clearly excludes cases in which a sentencing order has been entered by a district court." *United States v. Aviles*, 938 F.3d 503, 510 (3d Cir. 2019). As such, Neal's sentence was not impacted by the change in the mandatory minimums.

the person," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1), (3), (4).

The serious nature of Neal's crimes, as discussed at length above, highlights the continuing danger Neal poses to the community. Although the underlying facts of Neal's conviction did not involve the use of violence, the Court again notes the devastating and often violent impact that drug distribution has on a community. Moreover, each of Neal's crimes reflect a decades-long history of repeatedly placing his own pecuniary interests over the interests of the community.[21] Therefore, these factors also weigh against Neal's release.

## III.    CONCLUSION

For the foregoing reasons, Neal's Emergency Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) is **DENIED**.


DATED:                                          BY THE COURT:

October 9, 2020                            */s/ John M. Gallagher*
                                                      JOHN M. GALLAGHER
                                                      United States District Court Judge

---

[21] And even if the Court concluded that Neal was not a danger to the community—which it does not find—such a determination would not outweigh the sentencing factors discussed above. *See, e.g.*, *United States v. Santiago*, No. 16-505, 2020 WL 4015245, at *3-4 (E.D. Pa. July 15, 2020) (finding defendant who trafficked drugs and firearms posed danger to community but also that "rehabilitation, good works, and lack of danger to community do not outweigh other 3553(a) factors which support the need for him to serve the sentence imposed").